(57 South. 534.)

No. 18,506.

Succession of ALEXANDER.

(Jan. 15, 1912.   Rehearing Denied Feb. 12, 1912.)

*(Syllabus by the Court.)*

1. TENANCY IN COMMON (§ 55*) — MUTUAL LIABILITIES OF CO-OWNERS — SUFFICIENCY OF EVIDENCE.

The uncorroborated testimony of the surviving co-owner of a piece of real estate, to the effect that, as between her and the deceased co-owner, it was understood that she was not to be liable for any part of a debt of $1,000, secured by mortgage on the common property, is insufficient to release her from such liability, and particularly where it appears that she had joined with the deceased in making notes in renewal of the debt.

[Ed. Note.—For other cases, see Tenancy in Common, Dec. Dig. § 55.*]

2. PARTNERSHIP (§ 110*) — MUTUAL RIGHTS AND LIABILITIES—ACTIONS.

Where real estate held in common is sold, and one of the joint owners retains possession of the proceeds, the fact that he and the other joint owner are partners in the planting business is no bar' to an action by such other joint owner for the recovery of his share of the price, where it does not appear that the property was held as a partnership asset.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 110.*]

3. LIMITATION OF ACTIONS (§ 146*) — PRESCRIPTION — ACKNOWLEDGMENT OR NEW PROMISE—REQUISITES—SIGNATURE.

An unsigned memorandum, the date and meaning of which are uncertain, exhibited in a book which is produced by the opponent and shown to have been turned over to her after the death of the alleged debtor, is insufficient to establish an interruption of prescription against a claim for $500, said to have been loaned to the decedent.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 593–596; Dec. Dig. § 146.*]

4. CONTRACTS (§ 217*) — TERMINATION — OPTION.

The improbability that two persons will enter into a particular agreement may be said to disappear with the establishment of the fact that they actually did the improbable thing said to have been agreed on. Thus, though it may appear improbable that, immediately after executing an act of sale of real estate in which certain rights are reserved to the vendor, the vendee should propose to the vendor that the latter should collect the revenue from the property and, after paying the taxes and maintenance charges, appropriate the surplus to his own support; nevertheless, if that course was actually pursued for several years after the date of the sale, and up to the death of the vendee, who, in the meanwhile, paid no part of the purchase price, such facts, together with positive testimony, may be sufficient to prove that the proposition was made and acted on. But where, in such case, the revenues from the property far exceed the required outlay, and it is not shown that the vendor accepted the proposition, otherwise than by acting on it, and did not so bind himself that he could be held liable for such outlay in the event of its exceeding the revenue, and where other circumstances point to the conclusion that something in the nature of a donation or benefaction was intended, and not a contract which would bind the vendor, to his loss or prejudice, the arrangement, proposed and acted on, will be held to have been binding on the parties so long as they acquiesced in it, to have been terminable at the option of either, and to have been terminated when the executor of the vendee notified the vendor that he should no longer collect the revenue of the property.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1006–1009; Dec. Dig. § 217.*]

5. NOTARIES (§ 3*)—COMPENSATION—STATUTORY PROVISION.

The fees to which notaries are entitled for making inventories of succession property are regulated by Act No. 101 of 1870, according to

which the charge of a round sum, including other services, is inadmissible.

[Ed. Note.—For other cases, see Notaries, Dec. Dig. § 3.*]

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Charles A. O'Niell, Judge.

In the matter of the succession of Moses S. Alexander. From a judgment maintaining in part oppositions by Leah Hope and others to the provisional account of the executor, he appeals. Modified.

Allen & Pecot, for appellant. Borah & Himel, for appellee testamentary executor.

MONROE, J. Decedent died early in 1909, and in due time his executor filed a provisional account, which was opposed by Leah Hope, Frank Jackson, and W. J. Formento, and he has appealed from a judgment which, in part, maintained those oppositions.

[1] 1. Leah Hope claimed, originally, $1,175, with interest, as the balance due upon her share of the price of the "Daisy" plantation, and $500, money said to have been loaned to decedent. She was allowed $550 on the first item, and the $500 representing the second item, less $241.65, deducted on account of money shown to have been received by her from the decedent. She has answered the appeal and complains only of the reduction in the item of $500. We find that on September 17, 1906, opponent and decedent sold the "Daisy" plantation (which they owned in the proportions of ¼ and ¾) for $8,200, which price was paid by the notes of Henri Julien, the vendee; one, for $1,950, and five for $1,250 each, all of which notes the decedent kept in his possession. In order to make the sale it was necessary to clear the property of a mortgage that was resting on it, and the money for that purpose was borrowed from the Bank of Baldwin, on a note made by the vendors, with one of the Julien notes as collateral. The loan from the bank was renewed, probably, more than once, and, in the end, amounted to $1,250, for which amount the bank held a note made by the opponent and decedent, and secured as stated, which note has been paid by the estate of the decedent. The net amount realized from the sale of the plantation was therefore $6,950, of which opponent was entitled to ¼, or $1,737.50. She admits, in her opposition, that she received from the decedent, as of date January 1, 1909, one of the Julien notes for $1,250, so that the balance due her is $487.50. She testifies that it was understood that she was not to be liable for any part of the mortgage debt, but her testimony is improbable on its face, and is not only uncorroborated, but is in conflict with the fact that she joined with the decedent in borrowing money to pay that debt and in making a note for the money so borrowed. [2] It is said, on the other hand, that opponent and decedent were partners in the planting business, and that her only action is one for the settlement of the partnership; but it is not shown that the plantation was an asset of the partnership, and the mere fact that opponent and decedent were joint owners of a piece of real estate and were, at the same time, the partners of each other, in planting, is no bar to a suit by the one against the other with respect to the interest first mentioned. It is true that there is some indication, in the testimony, that the decedent used some of the Julien notes in obtaining money for the purposes of the partnership; but it is not shown to have been done with the knowledge or consent of the opponent, and in delivering to her one of the notes, under the circumstances stated, decedent appears to have admitted that she was entitled to her interest in them, in kind. We therefore conclude that upon this item opponent should be allowed $487.50, with interest at 8 per cent. from September 17, 1906, until paid. Opponent testifies that she loaned the decedent the $500 which she

here claims, in cash (though she kept a bank account), and that she took no receipt or other written evidence of the transaction. She says the loan was made in the summer of 1907, to assist decedent in taking up "Frank Jackson's notes." She also says that she was borrowing money from the banks, in 1907, for her planting operations, but that she loaned the $500 from money which she had kept in her possession and had not deposited in bank. Beyond that, it appears that, late in 1908, opponent called on the attorney who is now representing the executor and asked his advice as to the course that she should pursue in regard to her interest in the Julien notes; that he told her that Alexander was very sick and she had better call on him and have the matter adjusted; that she took the advice so given and called on Alexander, who sent to the bank and had one of the Julien notes brought to his house and delivered to her. There is some conflict in the testimony as to whether anything was then said about a balance being still due to opponent, or whether Alexander said that the delivery of the note was a settlement in full; but no one pretends that, either upon the occasion of opponent's visit to the attorney or upon that of her interview with Alexander, any claim was asserted for the $500 here demanded. On her cross-examination, the opponent was asked whether she was paid any money by Alexander in 1907, 1908, and 1909, and she answered, very positively, that she was not. She was then confronted with checks, for various amounts, drawn, in those years by Alexander to her order and by her indorsed and she admitted that she had collected the amounts called for by them, saying, as we understand her testimony, that the checks had been given in payment of money due her on account of the planting business, or to enable her to pay the laborers employed for the purposes of that business. [3] Opponent produced a small book containing a miscellaneous lot of entries, and among them a page, at the top of which appears the figures "1907–1908," and, below:

Frank Jackson to M. S. A.

Cash not (sic)........................ 27 00
From Leah ......................... 500 00

One of the witnesses testified that the handwriting is that of the decedent, but he seemed to be unable to recognize the other writing and figures in the same book, and it appears that the book had been turned over by the widow of the decedent to the opponent; that the widow had had some litigation, or threatened litigation, with the executor, which was compromised; that, as part of the compromise, the papers of the decedent were to have been turned over to the executor; that some papers were turned over; but that there was not a canceled check among them. Upon the whole, the book does not recommend itself. Finally, James Hope, the brother of the opponent, was called to corroborate her testimony upon the subject of the loan of the $500, and, like the opponent, he said the loan of the $500 was made in 1907, for the purpose of aiding Alexander in the purchase of Frank Jackson's place, and he further said that it was made on the prairie, on the Daisy plantation, before that plantation was sold. If, however, the money was borrowed for the purposes of the Jackson business, it must have been borrowed prior to the month of August, 1906, when that business was transacted, and, if it was borrowed on the Daisy plantation, and before the sale of that property, it must have been borrowed prior to September, 1906, when that sale took place. In either case, the claim is barred by the prescription of three years, which the executor pleads, since the opposition was not filed until December 7, 1909. This prescription cannot be held to have been interrupted by the entries in the little book, because they are unsigned and,

in our opinion, not sufficient for that purpose. C. C. art. 2278; Coyle v. Succession of Creevy, 34 La. Ann. 543; Weil v. Jacob's Estate, 111 La. 364, 35 South. 599; Succession of Driscoll, 125 La. 287, 51 South. 200.

[4] 2. Frank Jackson appears on the account as a creditor, on a mortgage note of $1,000, representing part of the purchase price of certain property sold by him to decedent; but, as against the amount called for by the note, the executor charges the opponent with $900, as rent collected from tenants upon the property.

The opponent sets up the note, also a stipulation, in the act of sale, of the property whereby he and his wife are to continue to live upon said property, and, further, an alleged subsequent, verbal agreement, whereby he is to have the right to collect the rents from certain tenements, other than that occupied by him and, after paying the expense of maintaining the property, to appropriate the balance to his own use, so long as the purchaser should live. He alleges, in the alternative, that, should the court hold that he must account for the rents, the amount collected is $728, and that he is entitled to set off, against the claim therefor, various amounts expended on the property and loaned to the owner, aggregating $506.83.

We think it necessary to say, in order that this matter may be made comprehensible to the ordinary mind, that the opponent is a negro, about 80 years of age, with a wife who is, probably, not much younger, and that he owned several lots lying contiguous to each other, near the depot in the town of Franklin, containing a superficial area about equal, as we infer, to a block 300 feet square, and having upon them the dwelling in which he lived, and a garden attached thereto, together with five other dwellings which appear to have brought a rental of about $5 per month each. Part of the property was subject to a mortgage, in order to clear off which the opponent, on August 8, 1906, sold a half interest in the part mortgaged to the decedent for $1,500; and thereafter, on August 20th, at the earnest solicitation of decedent, sold him the remaining half interest in said part, together with the whole interest in another lot, measuring 62x155 feet, for the recited consideration of $1,220, concerning which the act reads:

"Payable as follows, to wit: $220 payable one year from date, August 20, 1907, and which sum shall be a first mortgage and vendor's privilege on the property and be paid by preference out of the remaining portion of the purchase price, which is $1,000, and is payable three years from date, August 20, 1909; as representing which credit portion said vendee has made and signed his several two promissory notes, made payable at the epochs aforesaid, to the order of himself and by him indorsed in blank, dated with this act, with interest at the rate of eight per cent. per annum from date, payable annually, until paid, which said promissory note * * * have (sic) been delivered to said Frank Jackson, who acknowledges the receipt thereof as well as the cash portion of this sale."

The act contains a further stipulation as follows, to wit:

"In addition to the consideration expressed in this deed and in the deed passed before H. G. Block, the vendor reserves the right to live upon the premises sold, in the house now occupied by him, and reserves the use of the yard and garden attached to said premises. This right reserved to him so long as he or his wife lives; the vendors (to) exercise no right of ownership, but merely to occupy the one house and lot."

The story that the opponent now tells is: First, that he never saw or heard of any note for $220; next, that upon the same day that the act of sale was signed, Alexander came to his house and, to quote his testimony:

"He told me we would collect the rents and keep the entire expenses of the place, and the balance, we could use it. Q. When was that? Tell us exactly when that was. A. It was the day you passed the sale (the counsel having acted as the notary in the case). Q. Where was it you had that agreement? A. It was the day you, Mr. Borah, passed the sale. After the sale was over, I left and went down to my house, and Mose come down there, and my wife was kinder grumbling, and Mose told me everything was all right; we could collect the rent and keep the entire expense of the place and use the balance to live off."

He says that his wife and Dan Overton were present, and that there were two women in the house who had come to pay their rent and who went away; that he does not remember whether Jim Hope was there; that Alexander told him the same thing on several other occasions. He further says that his understanding was that he was to have the rents so long as he and his wife (and not so long as Alexander) lived.

The testimony so given is corroborated by that of Overton, who says:

"Mose said to the old man, Frank: 'Uncle, you just go on and collect these rents and keep the property and you live off the money, just so you keep the property up; you and your wife live off it and keep up the property and the taxes.' Q. Do you remember when that conversation was had? A. Yes, sir; we went back to old man Frank Jackson's house, after the sale was over. Q. And you are certain that Mose told him that? A. Yes, sir."

Leah Hope testifies that she heard Alexander say the same thing, more than once, to Frank Jackson, and the testimony of Lizzie Nelson, Amelia Doucet, and James Hope is much to the same effect. It must be confessed that the proposition or understanding relied on by the opponent, following, as it is said to have done, immediately upon the execution of the written instrument evidencing the sale of the property affected, bears upon its face an air of improbability; but it is to be borne in mind that the actors belong to a class who are not unlikely to deal with their affairs in unexpected ways, and the improbability disappears when we find that what we should be disposed to assume they would not do, they have actually done. Thus, there appears to be no doubt that, from the day of the sale up to that of his death, nearly three years later, Alexander allowed Jackson to collect the rents from the premises in question and dispose of them as he pleased, and it is beyond dispute that Jackson paid the taxes for the years 1906, 1907, and 1908, and also premiums of insurance for the years from 1907 to 1910, upon a policy covering not only the house that he lives in, but the other five tenements. We are inclined to think, too, that he expended some money in repairs, after the sale of the property; but as there is some uncertainty in the testimony as to the date of the repairs, we shall not enter into that question. On the other hand, it is not pretended that Alexander paid any taxes on the property, or kept it insured, and it is neither shown nor suggested that he paid the note of $220, or that he ever paid any one of the annual installments of interest on the note of $1,000. He seems to have been satisfied to have the title vested in him, and, paying no part of the price, to allow opponent the use of the property on condition of his paying the taxes and the cost of insurance and maintenance. The revenue from the property, however, far exceeded the required outlay, including compensation for opponent's services, upon any ordinary basis: and, as we find nothing in the record, save the fact that he acted upon decedent's offer, which would authorize a court to hold that opponent could be condemned for such outlay in the event of its exceeding the revenue, or, in fact, in any event, our conclusion is that the offer was intended as in the nature of a donation or benefaction, and not as the basis of a contract whereby opponent should, under any and all circumstances, be bound, to his loss or prejudice; that the arrangement resulting from such offer was therefore binding on the parties so long as they acquiesced in it, but was terminable at the option of either; and that it was terminated, when, after the death of Alexander, his legal representative notified opponent, or caused him to be notified, that he should collect no more rents. We are, accordingly, of opinion that opponent should recover on the note of $1,000, held by him, as prayed for, and without deduction or set-off.

[5] 3. Mr. W. J. Formento is placed on the account as a creditor in the sum of $25, for having, as notary, inventoried a single piece of real estate in New Orleans. He filed an opposition, claiming a larger amount, and was allowed $40. The question is governed by the law as heretofore interpreted by this court, according to which the charge of a round sum in such case, including other services, is inadmissible. Succession of Morgan (Whitney), 124 La. 755, 50 South. 703, and authorities there cited. On the basis fixed by the statute (Act No. 101 of 1870, p. 161) the amount allowed by the executor is as much as can be demanded.

It is therefore ordered, adjudged, and decreed that, as to the opposition of Leah Hope, the judgment appealed from be amended by reducing the aggregate amount allowed from $808.35 to $487.50, upon which last-mentioned amount opponent is allowed interest at the rate of 8 per cent. per annum from September 17, 1906, until paid; that, as to the opposition of Frank Jackson, said judgment be amended by allowing the opponent $1,000, with interest at the rate of 8 per cent. per annum, from August 20, 1906, until paid, and 10 per cent. as attorney's fees, upon the aggregate of the principal and interest of the note sued on; that, as to the opposition of W. J. Formento, said judgment be amended by reducing the amount thereby allowed to $25. It is further adjudged and decreed that the costs, in the district court of the oppositions of Leah Hope and Frank Jackson, be paid by the succession; that those of the opposition of W. J. Formento by the opponent; and that the costs of this appeal be paid by the succession, Leah Hope and W. J. Formento, in the proportions of three-sevenths each, by the succession and Leah Hope, and one-seventh by W. J. Formento. It is further decreed that in all other respects said judgment be affirmed.